United States District Court<br>
for the<br>
Southern District of Florida

| | |
|---|---|
| DeAndre Charles, Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 19-20235-Civ-Scola |
| Michael Brajdic and Miami-Dade | ) |
| County, Defendants. | ) |

## Order Granting Motion to Dismiss

Plaintiff DeAndre Charles complains that Defendant Michael Brajdic, a Miami-Dade County homicide detective, maliciously prosecuted him as well as falsely arrested and imprisoned him for the murder of Rabbi Joseph Raksin in North Miami Beach, in violation of the Constitution and state law. Charles also submits Defendant Miami-Dade County violated his privacy rights under the Fourth Amendment during a press conference where news of his arrest for the rabbi's murder was widely broadcast. The Defendants seek dismissal of the entirety of Charles's second amended complaint ("complaint") because he has failed to state a claim upon which relief may be granted under Federal Rule of Civil Procedure Rule 12(b)(6). After careful review, the Court **grants** the Defendants' motion (**ECF No. 36**).

1. **Legal Standard**

A court considering a motion to dismiss, filed under Federal Rule of Civil Procedure 12(b)(6), must accept all of the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Although a pleading need only contain a short and plain statement of the claim showing that the pleader is entitled to relief, a plaintiff must nevertheless articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqubal*, 556 U.S. 662, 678 (2009). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (internal punctuation omitted). A court must dismiss a plaintiff's claims if she fails to nudge her "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## 2. Facts[1]

Rabbi Joseph Raksin, visiting from New York, was shot and killed in an apparent robbery or attempted robbery on August 9, 2014. (2nd Am. Compl. ("Compl.") ¶ 14, ECF No. 35, 4.) The crime was investigated for sixteen months before Charles was arrested. (*Id.* at ¶ 16.)

During the investigation, evidence was uncovered that appeared to link Charles to the murder: an apparent DNA match was made between the crime scene and Charles (*id.* at ¶¶ 19, 21, 26); cell phone evidence appeared to place Charles at the crime scene (*id.* at ¶¶ 19, 22); an eyewitness identified Charles as walking away from the crime scene (*id.* at ¶¶ 19, 20, 23, 26, 27); and a week after the shooting, Charles, along with other suspects, was present when police stopped a black Cadillac Escalade that had been identified as having been involved in the rabbi's murder (*id.* at ¶¶ 35, 40, 78).

At the same time, additional evidence linked other suspects to the shooting. A confidential informant named three men who were involved in the murder: K.C., M.K., and D.P. (*Id.* at ¶ 35.) The police also received a tip through Crime Stoppers that K.C. and D.P. were involved. (*Id.* at ¶ 38.) Upon questioning a week after the murder, K.C. and D.P. gave inconsistent statements to the police regarding the day of the shooting: where they were; what they were doing; who they were with; and whether they were with each other. (*Id.* at ¶ 43.) Another man, J.S., told Brajdic that he was in the back of the Escalade on August 9, 2014, when K.S. ran from the scene of the shooting and told J.S. that he had "just bagged a Jew." (*Id.* at ¶ 58–64.) J.S. also identified M.K. and D.P. as being involved. (*Id.* at ¶57.) And J.S.'s description of K.C. and D.P.'s clothing on the day of the murder was similar to the description given by multiple residents near the crime scene of the clothing worn by two suspects seen fleeing. (*Id.* at ¶ 69.) J.S. additionally maintained that K.C., M.K., and D.P. threatened to kill him if he ever said anything about the murder. (*Id.* at 66.)

Further, a man who rented the Escalade to associates of K.C. and M.K described them as possibly "deadly." (*Id.* at ¶ 51.) Another man, Navin Romain, told Brajdic that his girlfriend's friend identified K.C., M.K., and D.P. as the rabbi's killers.[2] (*Id.* at ¶ 54.) Brajdic was also aware that K.C. was the subject of an unrelated attempted murder and a suspect in an armed robbery committed on August 8, 2014, the day before the rabbi's murder. (*Id.* at ¶ 70.) Brajdic also knew that a shell casing had been recovered from the August 8

---

[1] The Court accepts the complaint's factual allegations, as set forth below, as true for the purposes of evaluating the motion to dismiss. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

[2] Romain later recanted, however, according to Brajdic, and said he had been lying. (*Id.* at ¶ 55.)

armed robbery that matched a casing found at the scene of the rabbi's August 9 murder. (*Id.* at ¶ 73.)

According to Charles, Brajdic finally concluded, on December 8, 2015, that Charles had murdered the rabbi. (*Id.* at ¶ 18.) Charles describes this determination as having "caused" the Miami-Dade County State Attorney's Office to initiate criminal proceedings, which resulted in a grand-jury indictment against Charles for the rabbi's murder. (*Id.*; Arr. Warrant, ECF No. 36-1, 2; Pl.'s Resp., ECF No. 40, 6.)[3] The next day, on December 9, 2015, Charles, fifteen at the time, was arrested and charged with first-degree murder. (Compl. at ¶ 24.)

In conjunction with Charles's indictment and arrest, various "elected and appointed [County] officers and officials, appeared at and actively participated in a press conference" where Charles's arrest for the rabbi's murder was publicized. (*Id.* at ¶ 25.) A poster-sized photograph of Charles was placed on stage during the press conference. (*Id.* at ¶ 27.) Alongside the photograph, was a poster-sized, cartoonish sketch of a face, drawn by an eyewitness who saw the subject of the drawing walking away from the murder scene. (*Id.* at ¶¶ 27, 28.) The crudely-drawn sketch and its connection to Charles was widely disseminated on social media, where Charles was roundly mocked and ridiculed. (*Id.* at ¶¶ 28, 29.)

Charles then remained in custody for almost a year, until November 11, 2016—on the eve of trial—and thereafter was on house arrest until January 18, 2017, when the charges against him were ultimately dropped. (*Id.* at ¶¶ 30, 80, 82–84.)

### 3. Discussion

Charles has lodged four counts against Brajdic and one against the County. In count one and two he alleges § 1983 claims against Bradjic and the County, respectively, both arising under the Fourth Amendment. His claim against Brajdic is for an unlawful seizure which he says resulted from Brajdic's "grossly negligent or deliberately indifferent investigation" of the rabbi's murder. His § 1983 claim against the County is for an invasion of his privacy rights as a result of the press conference. Counts three, four, and five are state-law claims against Brajdic for, in turn, false arrest, false imprisonment, and

---

[3] Although the operative complaint fails to mention that Charles was indicted by a grand jury, the grand-jury indictment was alleged in a prior amended complaint. (Am. Compl. ¶ 86, ECF No. 25.) The grand-jury indictment is also referenced on the criminal docket in state court. (Grand Jury Indictment, *State v. Charles*, No. F-15-025055, DE 4 (Fla. Cir. Ct. Dec. 8, 2015).) Further, Charles has not objected to the Defendants' contention, citing *McDowell Bey v. Vega*, 588 Fed. App'x 923, 926 (11th Cir. 2014), that the Court may take judicial notice of the grand-jury indictment and, in fact, Charles acknowledges the indictment throughout his response to the motion to dismiss. (Pl.'s Resp. at 6, 7, 9, 17, 18, 19.)

malicious prosecution. Based on the analysis that follows, the Court dismisses all five counts.

### A. Charles fails to allege a lack of probable cause.

"[P]robable cause is a complete defense to false arrest, false imprisonment, and malicious prosecution." *Hart v. Mannina*, 798 F.3d 578, 590 (7th Cir. 2015); *see also Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003). While Charles acknowledges that, here, the grand-jury indictment amounts to prima facie evidence of probable cause, he nonetheless maintains he has set forth allegations sufficient to rebut the presumption. In support, he points to his allegations that the evidence available as a result of the police investigation clearly showed that K.C., M.K., D.P., and J.S. were the only four men involved in the rabbi's murder. Charles also maintains that, in light of these facts, Brajdic's investigation was grossly negligent or deliberately indifferent in that it led him to incorrectly conclude that Charles was the shooter. The Court is unconvinced that this amounts to a viable § 1983 claim.

To begin with, "a grand jury witness has absolute immunity from any § 1983 claim based on the witness testimony." *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012). Thus, to the extent Charles's claim rests on what he believes Brajdic may have testified to in front of the grand jury, his case fails. Moreover, even if Brajdic didn't have absolute immunity for his testimony, as one of the district-court cases Charles relies on suggests, there is no factual allegation in the complaint that Brajdic actually presented false or fabricated testimony to the grand jury. *See Biondolillo v. United States*, 05-21014-CIV, 2007 WL 5396950, at *2 (S.D. Fla. Apr. 4, 2007) (Seitz, J.) ("[A grand-jury] indictment procured with knowingly false testimony and/or intentional fabrication of evidence would not support a probable cause finding.").[4] Instead, Charles's allegations focus mostly on Brajdic's investigation, prior to any possible grand-jury presentation, or merely complain that he testified as to his mistaken conclusion that Charles murdered the rabbi (*e.g.*, Compl. at ¶ 79.)

On the other hand, and as Charles points out, this absolute immunity does not extend to all activity that a witness might have conducted outside of the grand jury room. *Rehberg*, 566 U.S. at 370 n. 1. That is, law enforcement officials are accorded only qualified immunity, and not absolute immunity, when a § 1983 plaintiff's allegation is that, for example, apart from any direct grand-jury testimony, the officer falsified an affidavit or fabricated evidence. *Id.* Charles has not set forth any allegations supporting either charge. Instead, he

---

[4] Notably, *Biondolillo* was decided years before the United States Supreme Court issued its opinion in *Rehberg*, recognizing absolute immunity for grand-jury testimony. *See Morris v. Town of Lexington Alabama*, 748 F.3d 1316, 1321 (11th Cir. 2014) (recognizing that *Rehberg* holds that a grand-jury witness has absolute immunity from any § 1983 claim based on grand-jury testimony).

merely sets forth a series of facts that he believes Brajdic didn't properly account for in determining that Charles should be charged for the murder.

Relatedly, Charles argues that his complaint should survive dismissal because Brajdic's shoddy investigation *caused* the grand-jury to indict Charles. He points to cases which he describes as relying on the "tainted evidence exception." These cases, he submits, support his § 1983 claims because they stand for the proposition that "[i]f a claimant can show the deliberations of the independent intermediary were in some way tainted by the defendant, the presumption of probable cause is rebutted." *Buehler v. City of Austin*, A-13-CV-1100-ML, 2015 WL 737031, at *12 (W.D. Tex. Feb. 20, 2015), *aff'd sub nom. Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548 (5th Cir. 2016); *see also Zargari v. United States*, 13-23806-CIV, 2015 WL 1587942, at *5 (S.D. Fla. Apr. 9, 2015), *aff'd*, 658 Fed. App'x 501 (11th Cir. 2016) ("A plaintiff may rebut the *prima facie* effect of a grand jury indictment by a showing of specific evidence that there was deliberate and malicious fraud perpetrated on the grand jury to induce it to indict the plaintiff.") (quotations omitted). However, and as Charles himself recognizes, in order to prevail, a claimant must show that the grand jury's deliberations were actually tainted by the actions of the defendant. *Buehler v. City of Austin*, 2015 WL 737031, at *12. And this is where Charles's argument falls apart. Throughout his complaint, any connection between Brajdic's allegedly "grossly negligent or deliberately indifferent investigation" and the grand-jury indictment issued against Charles is expressed in only the most conclusory and vague fashion. For example, Charles maintains that Brajdic's baseless conclusion that Charles murdered the rabbi "caused the Miami-Dade County State Attorney's Office to initiate criminal proceedings to obtain the Indictment." (Compl. at ¶ 18; ¶ 33 (same); ¶ 88 (same).) But what did Brajdic actually do or say to set this chain of events in motion? What information did the state attorney relay to the grand jury? How did this information, assuming it even came from Brajdic, taint the whole indictment process? While Charles alleges a number of pieces of evidence that he believes clearly undercut the conclusion that he murdered the rabbi and how he thinks Brajdic botched the investigation, he doesn't cite one scintilla of evidence regarding what Brajdic actually communicated or presented to either the state attorney or the grand jury and how those communications themselves tainted the proceedings. Indeed, Charles's allegations leave wide open the possibility that Brajdic submitted the universe of evidence outlined in Charles's complaint to the grand jury and it chose to indict him anyway.

Charles also complains that, based on the available evidence, it was unreasonable for Brajdic to institute criminal proceedings against him without completing further investigations. (Compl. at ¶¶ 77, 89.) Even if true, however, this allegation doesn't come close to showing that the grand-jury process itself

was tainted because of Brajdic's incomplete investigation. Indeed, "a negligent investigation alone is not sufficient to show a deliberate and malicious fraud on the grand jury." *Zargari*, 2015 WL 1587942 at *5.

In sum, the fatal flaw central to Charles's complaint is that he is unable to actually connect the alleged gross shortcomings of Brajdic's investigation or Bradjic's own incorrect conclusions that Charles was the killer to a concrete tainting of the grand jury's deliberations. Because of this unbridgeable gap, he simply cannot overcome the presumption of probable cause and therefore is unable to maintain his § 1983 claim against Brajdic based on violations of the Fourth Amendment as set forth in count one.

### B. Charles fails to allege anything more than vicarious liability against Miami-Dade County.

"Ordinarily, a county may only be sued under section 1983 when a plaintiff's injuries are caused by an official policy of the county." *Gaviria v. Guerra*, 17-23490-CIV, 2018 WL 1876124, at *5 (S.D. Fla. Apr. 19, 2018) (Altonaga, J.) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). That is, municipalities and other local-government entities are subject to liability under § 1983 and may be sued directly for relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Only if the alleged constitutional violations resulted from a custom, policy, or practice of a local government entity may that entity be held liable. *Id.* at 694; *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987); *see also Farred v. Hicks*, 915 F.2d 1530, 1532–33 (11th Cir. 1990) ("Governmental entities may be held liable under section 1983 when a governmental 'policy or custom' is the 'moving force' behind the constitutional deprivation.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

Generally, demonstrating a custom or practice within a municipality requires showing "a persistent and wide-spread practice." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) However, "[a]lthough local governments cannot be held liable merely on a theory of respondeat superior, a single decision by an official policymaker can establish the existence of an unconstitutional municipal policy." *Martinez v. City of Opa-Locka, Fla.*, 971 F.2d 708, 713 (11th Cir. 1992) (internal citation omitted). In determining if a single act is sufficient, the Court is guided by the following principles:

> (1) Municipalities have section 1983 liability only for acts officially sanctioned or ordered by the municipality. (2) Only those municipal officials who have 'final policymaking authority' may subject the municipality to section 1983 liability for their actions.

(3) The determination of whether or not a particular official has 'final policymaking authority' is governed by state law, including valid local ordinances and regulations. (4) The challenged action must have been taken pursuant to a policy adopted by the official or officials responsible for making policy in that particular area of the city's business, as determined by state law.

*Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 997 (11th Cir. 1990) (quoting *City of St. Louis v. Prapotnik*, 485 U.S. 112, 123 (1988) (internal quotations omitted)).

Here, Charles does not point to a county-wide policy, but instead focuses on the isolated decision of the mayor and various other officials to appear at a press conference. He alleges that unnamed "elected and appointed officers and officials[] appeared at and actively participated in a press conference" that resulted in an invasion of his privacy rights under the Fourth Amendment. (Compl. at ¶ 25.) He specifically names certain "high-ranking officials," such as the mayor and the police department's director, and identifies, generally, "attorneys from the Miami-Dade County State Attorney's Office" as being "present on stage" for and actively participating in the press conference. (*Id.* at ¶¶ 26, 94.) Charles further explains that the "high-ranking agents and elected and appointed officials from Miami-Dade County" "actively participated in the press conference by remaining on stage throughout the press conference." (*Id.* at ¶ 97.)

These allegations are simply not enough to establish an unconstitutional municipal policy. Charles seems to believe that the mayor's mere presence on stage and "active[] participat[ion]" in the press conference amounts to an act that was performed by virtue of an informally approved "established custom, policy, or usage." (Pl.'s Resp. at 14.) But Charles fails to allege that the mayor or any other person affiliated with the County's appearance was "officially sanctioned or ordered by" the County. Nor does he allege that any County official at the press conference had "final policymaking authority" for such appearances. And, finally, Charles presents no evidence that the appearances were made "pursuant to a policy adopted by the official or officials responsible for making policy in that particular area of the city's business, as determined by state law." *Bannum*, 901 F.2d at 997.

Since Charles has not alleged a custom, policy, or practice, his § 1983 claim against the County cannot survive dismissal.

4. **Conclusion**

While the Court recognizes the tragedy of Charles's nearly yearlong detention prior to the charges against him being dropped, it nonetheless cannot find that his allegations amount to viable claims against either

Defendant in this case. The Court thus **grants** the Defendants' motion to dismiss (**ECF No. 36**).

Charles has had multiple opportunities to state a claim and has failed to do so and it appears any further amendment would be futile. The Court therefore dismisses Charles's federal claims with prejudice and without leave to amend. Further, Charles has not requested leave to amend; nor has he indicated in his response to the Defendants' motion any inclination whatsoever to do so. *Wagner v. Daewoo Heavy Industries Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."); *Avena v. Imperial Salon & Spa, Inc.*, 17-14179, 2018 WL 3239707, at *3 (11th Cir. July 3, 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend.")

Finally, because the Court has dismissed all of Charles's federal claims, it declines to exercise supplemental jurisdiction over his state-law claims. *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997) ("State courts, not federal courts, should be the final arbiters of state law."); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir.2004) ("encourage[ing] district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial"). The Court therefore dismisses, without prejudice, Charles's state-law claims against Brajdic for false arrest, false imprisonment, and malicious prosecution.

The Clerk is directed to **close** this case. Any pending motions are **denied as moot**.

**Done and ordered**, in chambers at Miami, Florida, on October 28, 2019.

_____
Robert N. Scola, Jr.
United States District Judge